THIRD DIVISION

No. 1-08-1202

| | | |
|---|---|---|
| MATTHEW D. WILSON, TROY EDHLUND, and JOSEPH MESSINEO, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiffs-Appellants, | ) ) ) | |
| v. | ) ) | No. 07 CH 4848 |
| COOK COUNTY, a Public Body and Corporate, TODD STROGER, Board President, in His Official Capacity, and its Board of Commissioners in Their Official Capacities, namely: EARLEAN COLLINS, ROBERT STEELE, JERRY BUTLER, WILLIAM M. BEAVERS, DEBORAH SIMS, JOAN PATRICIA MURPHY, JOSEPH MARIO MORENO, ROBERT MALDONADO, PETER N. SILVESTRI, MIKE QUIGLEY, JOHN P. DALEY, FOREST CLAYPOOL, LARRY SUFFREDIN, GREGG GOSLIN, TIMOTHY O. SCHNEIDER, ANTHONY J. PERAICA, ELIZABETH ANN DOODY GORMAN, and THOMAS DART, Sheriff of Cook County, in his Official Capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Mary K. Rochford, Judge Presiding. |
| Defendants-Appellees. | ) | |

JUSTICE MURPHY delivered the judgment of the court, with opinion.

Presiding Justice Quinn and Justice Neville concurred in the judgment and opinion.

This appeal arises from the dismissal of plaintiffs' (Matthew D. Wilson, Troy Edhlund, and

No. 1-08-1202

Joseph Messineo) amended complaint seeking declaratory judgment and injunctive relief against

defendants (Cook County, the Cook County commissioners, and Cook County Sheriff Tom

Dart). Specifically, plaintiffs sought a declaration that the Blair Holt Assault Weapons Ban (Cook

County Ordinance No. 06-O-50 (Nov. 14, 2006), amending Cook County, Illinois, Code of

Ordinances §54–211 *et seq.* (eff. Jan. 1, 1994)) (Ordinance) was unconstitutional. On April 29,

2008, the trial court dismissed plaintiffs' first amended complaint pursuant to section 2-615 of the

Code of Civil Procedure. 735 ILCS 5/2-615 (West 2006). The trial court found that: (1) the

Ordinance is not unconstitutionally vague or overbroad; (2) plaintiffs did not state a cause of

action for violation of the due process and equal protection clauses of the United States

Constitution; (3) the Ordinance did not violate article I, section 22, of the Illinois Constitution (Ill.

Const. 1970, art. I, §22) or the second amendment of the United States Constitution (U.S. Const.,

amend. II); and the county properly exercised its police powers in enacting the Ordinance.

Plaintiffs appealed and advanced several arguments. This court held that the United States

Supreme Court's holding in *District of Columbia v. Heller*, 554 U.S.__, 128 S. Ct. 2783 (2008),

provided that the second amendment grants a right to bear arms within the home for self-defense

and limited application of the right to federal laws. *Wilson v. Cook County*, 394 Ill. App. 3d 534,

537-42 (2009). We held that the *Heller* Court did not announce that the second amendment

provides a fundamental right to bear arms and rejected plaintiffs' argument that it must be

incorporated under the fourteenth amendment and applied to the states. Based on this finding and

*Heller*'s limited federal reach, we found that Illinois precedent on this issue stood and affirmed the

dismissal of plaintiffs' complaint as the individual right to bear arms remained subject to the police

-2-

No. 1-08-1202

power. *Wilson*, 394 Ill. App. 3d at 542-44. We also found that, without an announced standard of strict scrutiny review, the trial court properly denied plaintiff's argument the Ordinance was vague and overly broad - a doctrine not considered out of the first amendment context by Illinois courts. *Wilson*, 394 Ill. App. 3d at 544-46. Finally, denial of plaintiff's equal protection and waiver claims was affirmed for plaintiff's failure to sufficiently plead facts in support. *Wilson*, 394 Ill. App. 3d 546-47.

Following denial of plaintiff's petition for rehearing, this court corrected its opinion and plaintiff filed a petition for leave to appeal before our supreme court. While that petition was pending, the United States Supreme Court issued *McDonald v. City of Chicago*, __ U.S. __, 130 S. Ct. 3020 (2010). Our supreme court entered a supervisory order directing this court to vacate our prior holding and reconsider the judgment in light of *McDonald. Wilson v. Cook County*, 237 Ill. 2d 593 (2010). That judgment was vacated. Both parties provided supplemental briefs. For the following reasons, we affirm the trial court's dismissal of the remaining counts in plaintiffs' complaint.

## I. BACKGROUND

The Ordinance was originally enacted in 1993 by the Cook County Board of Commissioners (Commissioners) as the Cook County Deadly Weapons Dealer Control Ordinance to ban certain assault weapons and assault ammunition. Cook County Ordinance No. 93-O-37 (eff. Jan. 1, 1994). In the prefatory clauses, the Commissioners cited to the public health, safety, and welfare concerns caused by both assault weapons and guns in general. The Ordinance set forth several supporting facts, including: 1,000 of the 4,500 trauma cases handled by Cook

County Hospital that year were due to gunshot wounds; there were more federally licensed gun dealers in Cook County than gas stations; an estimated 1 in 20 high school students had carried a gun in the prior month; and assault weapons are 20 times more likely to be used in the commission of a crime than other kinds of weapons. In addition, the Commissioners stated that there was no legitimate sporting purpose for the military-style assault weapons used on the streets.

Prior to its effective date, the Ordinance was amended to remove the prohibitions on the sale, transfer, acquisition, or possession of assault ammunition. Cook County Ordinance No. 93-O-46 (amended Nov. 16, 1993). The Ordinance prohibited the sale, transfer, acquisition, ownership, or possession of assault weapons, defined as 1 of a list of 60 types or models of high capacity, rapid-fire rifles or pistols. The Ordinance required any owners of the defined assault weapons to remove them from Cook County, modify them, or surrender them to the Cook County sheriff within 14 days of the enactment. Failure to comply with the Ordinance would result in a criminal penalty including a fine and possible imprisonment.

The Ordinance was amended again in 1999 to modify sections not at issue in this appeal; however, additional prefatory language was included to support the ban as necessary to protect the public welfare by reducing violent crime and the huge costs associated with those crimes. The Commissioners indicated that the revisions were based not only on the prolific black-market sales of weapons, but those by licensed dealers. The Commissioners cited undercover investigations and studies conducted by Cook County, the City of Chicago, the Cook County State's Attorney's office, and the Bureau of Alcohol, Tobacco and Firearms, which indicated that weapons utilized

in the commission of crimes are traced to licensed gun dealerships. Cook County Ordinance No. 99-O-27 (amended November 23, 1999).

On November 14, 2006, the Ordinance was amended to apply to both assault weapons and large capacity magazines and expand the list of banned weapons and definition of those weapons. In addition, the time period for removal, surrender, or rendering inoperable was expanded from 14 to 90 days. Cook County Ordinance No. 06-O-50 (amended Nov. 14, 2006). The Ordinance was also amended in 2007 to change the name to the Blair Holt Assault Weapons Ban. Cook County Ordinance No. 07-O-36 (adopted June 19, 2007).

As for the specific provisions, section 54-211 of the Ordinance provides these definitions, followed by a nonexhaustive list of specifically banned weapons:

"*Assault weapon* means:

(1) A semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise and one or more of the following:

(A) Only a pistol grip without a stock attached;

(B) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(C) A folding, telescoping or thumbhole stock;

(D) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or

(E) A muzzle brake or muzzle compensator;

(2) A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of ammunition;

(3) A semiautomatic pistol that has the capacity to accept a detachable magazine and has one or more of the following:

(A) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(B) A folding, telescoping or thumbhole stock;

(C) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

(D) A muzzle brake or muzzle compensator; or

(E) The capacity to accept a detachable magazine at some location outside of the pistol grip.

(4) A semiautomatic shotgun that has one or more of the following:

(A) Only a pistol grip without a stock attached;

(B) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(C) A folding, telescoping or thumbhole stock;

(D) A fixed magazine capacity in excess of five rounds; or

     (E) An ability to accept a detachable magazine;

   (5) Any shotgun with a revolving cylinder.

   (6) Conversion kit, part or combination of parts, from which an assault weapon can be assembled if those parts are in the possession or under the control of the same person." Cook County, Illinois, Code of Ordinances §54–211 (amended Nov. 14, 2006).

The Ordinance specifically excludes "any firearm that has been made permanently inoperable *** 'antique firearm[s]' *** or weapons designed for Olympic target shooting events." Cook County, Illinois, Code of Ordinances §54–211 (amended Nov. 14, 2006). In addition, section 54-211 provides further detailed definitions:

   "*Detachable magazine* means any ammunition feeding device, the function of which is to deliver one or more ammunition cartridges into the firing chamber, which can be removed from the firearm without the use of any tool, including a bullet or ammunition cartridge.

   *Large capacity magazine* means any ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

     (1) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

     (2) A 22 caliber tube ammunition feeding device.

     (3) A tubular magazine that is contained in a lever-action firearm.

*Muzzle brake* means a device attached to the muzzle of a weapon that

utilizes escaping gas to reduce recoil.

*Muzzle compensator* means a device attached to the muzzle of a weapon

that utilizes escaping gas to control muzzle movement." Cook County, Illinois,

Code of Ordinances §54–211 (amended Nov. 14, 2006).

Plaintiffs filed the instant cause of action as law-abiding residents of Cook County. Each

plaintiff indicated that he had never been convicted of a crime, had a properly issued firearm

owner's identification card, and had legally purchased guns that were subject to the Ordinance's

ban. Plaintiffs indicated the guns were owned as part of collections, for self-defense, or for

recreational purposes. This appeal followed the trial court's dismissal of plaintiffs' complaint

pursuant to section 2-615 of the Code of Civil Procedure.

## II.  ANALYSIS

A motion to dismiss under section 2-615 of the Code of Civil Procedure challenges the

legal sufficiency of a complaint based on facial defects of the complaint. *Borowiec v. Gateway*

*2000, Inc.*, 209 Ill. 2d 376, 413 (2004). This court conducts a *de novo* review of a trial court's

ruling on the sufficiency of a motion to dismiss. *U.S. Bank National Ass'n v. Clark*, 216 Ill. 2d

334, 342 (2005). While allegations in the complaint are viewed in a light most favorable to the

plaintiff, the decision to dismiss a case may be affirmed on any basis contained in the record.

*Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 196 (1999). As noted above, plaintiffs' claims

that the Ordinance violated the equal protection clause and failed to provide a *scienter*

requirement were previously rejected by this court based on plaintiffs' pleadings and are not

affected by the ruling in *McDonald*. Therefore, we begin with a discussion of the holdings in *Heller* and *McDonald* prior to addressing plaintiffs' surviving arguments in turn.

A. *District of Columbia v. Heller* and *McDonald v. City of Chicago*

The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In *Heller*, the Supreme Court considered the District of Columbia's handgun ban that "totally bans handgun possession in the home." *Heller*, 554 U.S. at__, 128 S. Ct. at 2817. The ban required that any lawful firearm in the home be either dissembled or rendered inoperable by a trigger lock. *Heller*, 554 U.S. at__, 128 S. Ct. at 2817. Both the majority and the dissent embarked on extensive reviews of the history and meaning of the second amendment in coming to opposite conclusions regarding the original meaning and understanding of the amendment.

For our purposes, we are not concerned with the majority's use of plain meaning originalism or the basis of the dissent's position. Only the conclusions of the majority are important. First, the majority found that the original understanding of the amendment was grounded in the belief that the right to bear arms ensured not only that a militia could easily be formed if needed, but inherently that it provided protection from tyranny. *Heller*, 554 U.S. at__, 128 S. Ct. at 2801-02. The majority concluded that it was also popularly understood as an individual right to self-defense- -unconnected to militia service- -particularly for the defense of one's home and hearth. *Heller*, 554 U.S. at__, 128 S. Ct. at 2802-12.

Looking to precedents covering the second amendment, the Court concluded that its

holding that an individual right to self-defense was not foreclosed by its earlier holdings in *United States v. Cruikshank*, 92 U.S. 542 (1875), *Presser v. Illinois*, 116 U.S. 252 (1886), and *Miller v. Texas*, 153 U.S. 535 (1894). As in those cases, the Court did not examine the meaning or scope of the second amendment. *Heller*, 554 U.S. at__, 128 S. Ct. at 2812-13. The *Heller* majority held that the second amendment provides the individual right to bear arms typically possessed by law-abiding citizens for lawful purposes, such as self-defense in the home. *Heller*, 554 U.S. at__, __, 128 S. Ct. at 2801-02, 2815-16. The court concluded that the ban at issue amounted to a prohibition of an entire class of arms that was "overwhelmingly" accepted and properly utilized for self-defense in the home by the general population. *Heller*, 554 U.S. at__, 128 S. Ct. at 2821-22. As such, the District of Columbia's ban on handgun possession in the home, as well as its requirement that any lawful firearm be rendered inoperable while in the home, was found to be unconstitutional. *Heller*, 554 U.S. at__, 128 S. Ct. at 2817-22.

It is important to note that the Court explicitly acknowledged and stated that this was its first in-depth analysis of the second amendment and that "one should not expect it to clarify the entire field." *Heller*, 554 U.S. at__, 128 S. Ct. at 2821. Along those lines, the opinion allowed that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by [a nonexhaustive list of categories such as] felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at__, 128 S. Ct. at 2816-17. These types of measures were further identified as "presumptively lawful regulatory measures." *Heller*, 554 U.S. at__ n.26, 128 S. Ct. at 2817 n.26.

The Supreme Court recently considered its holding in *Heller* when it issued its decision in *McDonald*. In *McDonald*, a plurality of the Court followed *Heller* in holding that the right to possess a handgun in the home for the purpose of self-defense is protected by the second amendment as a fundamental right. As foreshadowed by *Heller*, the *McDonald* Court found that the right was applicable to the states under the due process clause of the fourteenth amendment. *McDonald*, __ U.S. __, 130 S. Ct. at 3050. Therefore, the Supreme Court struck down ordinances from the City of Chicago and City of Oak Park, Illinois. The ordinances prohibited any person within the city to possess any handgun unless the handgun had been registered by the owner. For Chicago, the handgun had to be registered with the city prior to March 30, 1982, and the handgun had to have trigger lock and load indicator devices. The *McDonald* Court focused on the incorporation issue, refusing to expand the *Heller* Court's interpretation and leaving unclear the appropriate standard of review to follow for reviewing restrictions of the second amendment right.

## B. The Standard of Review

Several federal district courts and courts of appeal have addressed the proper standard of review to apply to legal prohibitions which might violate a citizen's rights under the second amendment. In *United States v. Chester*, No. 09-4084, (4th Cir. Dec. 30, 2010), the Fourth Circuit Court of Appeals considered a federal statute prohibiting persons convicted of a misdemeanor crime of domestic violence from possessing firearms. 18 U.S.C. §922(g)(9) (2006). In upholding the ban, the *Chester* court held:

"Thus, a two-part approach to Second Amendment claims seems

appropriate under *Heller*, as explained by the Third Circuit Court of Appeals,

[*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)] ***. The first

question is 'whether the challenged law imposes a burden on conduct falling within

the scope of the Second Amendment's guarantee.' *Id.* This historical inquiry

seeks to determine whether the conduct at issue was understood to be within the

scope of the right at the time of ratification. *See Heller*, 128 S. Ct. at 2816. If it

was not, then the challenged law is valid. *See Marzzarella*, 614 F.3d at 89. If the

challenged regulation burdens conduct that was within the scope of the Second

Amendment as historically understood, then we move to the second step of

applying an appropriate form of means-end scrutiny. *See id. Heller* left open the

issue of the standard of review, rejecting only rational-basis review. Accordingly,

unless the conduct at issue is not protected by the Second Amendment at all, the

Government bears the burden of justifying the constitutional validity of the law."

*Chester*, slip op. at 11-12.

In upholding a federal statute prohibiting the possession of firearms with obliterated serial

numbers, the *Marzzarella* court found that the proper standard of review depended on the type of

law challenged and the extent of the restriction imposed. *Marzzarella*, 614 F.3d at 96-97. In

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010), the Tenth Circuit Court of Appeals upheld

a section of the same statute considered in *Chester*. In doing so, the court also extensively cited

to *Marzzarella*:

"In recent months, both the Third and Seventh Circuits have applied

intermediate scrutiny to Second Amendment challenges to federal firearm laws.  In *Marzzarella*, the Third Circuit, citing analogous First Amendment cases, concluded that '[w]hether or not strict scrutiny may apply to particular Second Amendment challenges, it is not the case that it must be applied to all Second Amendment challenges.' [*Marzzarella*, 614 F.3d at 96.]  In other words, the Third Circuit concluded, 'the Second Amendment can trigger more than one particular standard of scrutiny,' depending, at least in part, upon 'the type of law challenged and the type of [Second Amendment restriction] at issue.' [*Marzzarella*, 614 F.3d at 97.]  The Third Circuit in turn concluded that the specific statute it was reviewing, 18 U.S.C. § 922(k), which prohibits the possession of firearms with obliterated serial numbers, 'should be evaluated under intermediate scrutiny' because '[t]he burden imposed by the law [did] not severely limit the possession of firearms,' as did '[t]he District of Columbia's handgun ban' that was at issue in *Heller*.  *Id.*  Turning again to analogous First Amendment cases, the Third Circuit framed the intermediate scrutiny inquiry in this way: whether the challenged law served a 'significant,' 'substantial,' or 'important' governmental interest, and, if so, whether the 'fit between the challenged [law] and the asserted objective [wa]s reasonable, not perfect.' [Citation.]" *Reese*, 627 F.3d at 801.

The Seventh Circuit utilized a similar test when it considered the prohibitions of 18 U.S.C. §922(g)(9) in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010).  The statute prohibits any person convicted of a misdemeanor crime of domestic violence from possessing firearms.  *Skoien*,

614 F.3d at 642. In applying intermediate scrutiny to its review of the law, the *Skoien* court took from *Heller* "the message that exclusions need not mirror limits that were on the books in 1791." *Skoien*, 614 F.3d at 641. The court added that "some categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court. *Heller* did not suggest that disqualifications would be effective only if the statute's benefits are first established by admissible evidence." *Skoien*, 614 F.3d at 641. Noting that categorical limits on the possession of firearms would not be a constitutional anomaly by citing categorical limits on free speech such as obscenity and defamation, the court found that both "logic and data establish a substantial relation between" the statute and the objective of preventing armed mayhem. *Skoien*, 614 F.3d at 642. The Seventh Circuit also applied intermediate scrutiny to a statute barring felons from firearm possession, *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) and to a statute barring controlled substance addicts from possessing firearms in *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010).

We adopt the District of Columbia District Court's overview provided in *Heller v. District of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010) (*Heller II*), where the plaintiffs' challenged the firearm restrictions passed by the District of Columbia council in response to *Heller*:

> "[T]he majority of courts to have considered this issue [hold] that intermediate
> scrutiny is the most appropriate standard of review to apply to the challenged laws.
> This standard satisfies the *Heller* Court's directive that courts apply an exacting
> measure of scrutiny to laws limiting the exercise of this specific, constitutionally

enumerated right, *see Heller*, [554 U.S. at__ & n.27, 128 S. Ct. at 2817 & n.27], while avoiding the inconsistencies that would arise were it to apply strict scrutiny, *see, e.g., Marzzarella*, 595 F. Supp. 2d at 604. Intermediate scrutiny will come into play, of course, only in cases in which the law implicates the core Second Amendment right, namely, 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.' [Citation.]

In sum, to assess the constitutionality of each of the challenged provisions, the court will begin by determining whether the provision at issue implicates the core Second Amendment right. If it does not, then the court will uphold the regulation. If the regulation does, however, implicate the core Second Amendment right, the court will apply intermediate scrutiny to determine whether the measure is substantially related to an important governmental interest." *Heller II*, 698 F. Supp. 2d at 188.

C. The Scope of Protected Conduct Under *Heller* and *McDonald*

Unlike the blanket prohibitions of handguns in *Heller* and *McDonald*, the Ordinance bans a smaller subgroup of firearms and attachments. Applying the rationales found in the aforementioned federal cases, we first consider "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Marzzarella*, 614 F.3d at 89. In doing so, we need to determine whether the conduct at issue was understood to be within the scope of the right at the time the second amendment was ratified. *Chester*, slip op. at 12, citing *Heller*, 554 U.S. at__, 128 S. Ct. at 2816.

*Heller* addressed which types of firearms may be protected by the second amendment as follows:

"The 18th-Century meaning [of "arms"] is no different than the meaning today. \*\*\*

The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity. \*\*\* \*\*\* Just as the First Amendment protects modern forms of communications, *e.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, *e.g.*, *Kyllo v. United States*, 533 U.S. 27, 35-36 (2001), the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at\_\_, 128 S.Ct. at 2791-92.

Therefore, the *Heller* Court "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at\_\_, 128 S. Ct. at 2815-16, citing *Miller*, 307 U.S. 174, 179 (1939). The *Heller* Court specifically mentioned that M-16 rifles and other weapons most useful in military service may be banned. *Heller*, 554 U.S. at\_\_, 128 S. Ct. at 2817.

In *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008), the Eighth Circuit Court of Appeals reviewed the defendant's conviction for possessing a machine gun and a sawed-off shotgun, holding: "Accordingly, under *Heller* [, 554 U.S. at\_\_, 128 S. Ct. at 2815-16], Fincher's possession of the guns is not protected by the Second Amendment. Machine guns are not in

common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." *Fincher*, 538 F.3d at 874.

In *People v. James*, 94 Cal. Rptr. 3d 576 (Cal. Ct. App. 2009), the Court of Appeal of California considered *Heller*'s impact on California's Roberti-Roos Assault Weapons Control Act of 1989. (Cal. Penal Code §§12280(b), (c) (West 2006) (Act). Section 12276 of the Act defined "assault weapon" in the same manner as the Ordinance - mentioning weapons by both manufacturer and model and by type. Section 12276.1(5) included "a semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds." Cal. Penal Code §12276.1(5) (West 2006). In interpreting *Heller*, the *James* court held:

> "Accordingly, 'the right secured by the Second Amendment is not...a right
> to keep and carry any weapon whatsoever in any manner whatsoever and for
> whatever purpose.' [*Heller*, 554 U.S. at__, 128 S. Ct. at 2816.] Rather, it is the
> right to possess and carry weapons typically possessed by law-abiding citizens for
> lawful purposes such as self defense. [*Heller*, 554 U.S. at__, 128 S. Ct. at 2816.]
> It protects the right to possess a handgun in one's home because handguns are a
> 'class of "arms" that is overwhelmingly chosen by American society' for the lawful
> purpose of self-defense. [*Heller*, 554 U.S. at__, 128 S. Ct. at 2817.]" *James*, 94
> Cal. Rptr. 3d at 585.

The court then considered that, in enacting the Act, "the Legislature was specifically concerned with the unusual and dangerous nature of these weapons. An assault weapon 'has such

a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.' *** These are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war." *James*, 94 Cal. Rptr. 3d at 585-86, quoting Cal. Penal Code §75.5(a) (West 2006). The court continued:

> "While the fully-automatic nature of a machine gun renders such a weapon arguably more dangerous and unusual than a semiautomatic assault weapon, that observation does not negate the fact that assault weapons, like machine guns, are not in common use by law-abiding citizens for lawful purposes and likewise fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." *James*, 94 Cal. Rptr. 3d at 586.

Therefore, the *James* court concluded that the relevant portion of the Act did not prohibit conduct protected by the second amendment as defined in *Heller*. *James*, 94 Cal. Rptr. 3d at 586.

In *Heller II*, the court considered the challenge to new restrictions passed by the council of District of the Columbia in response to the holding in *Heller*. The laws at issue were very similar to the Ordinance before us, as well as the statute considered in *James*. The *Heller II* plaintiffs pursued a similar challenge to the new laws containing: (1) firearm registration procedures; (2) a prohibition on assault weapons; and (3) a prohibition on large capacity ammunition feeding devices. *Heller II*, 698 F. Supp. 2d 179. While the *Heller II* court upheld all of the challenged provisions, we will review only its holding as to the prohibitions on assault

weapons and large capacity ammunition feeding devices.

The District of Columbia law defined "large capacity ammunition feeding device" as including magazines that have " 'a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.' " *Heller II*, 698 F. Supp. 2d at 193 n.14 (quoting D.C. Code §7-2506.01(b) (2009)). As the plaintiffs do before us, the plaintiffs in *Heller II* argued that assault weapons " 'are not made or designed for offensive military use,' " " 'are not disproportionately used in crime,' " and in fact are commonly used for lawful purposes, such as target shooting, hunting and personal protection. *Heller II*, 698 F. Supp. 2d at 194. However, the court noted that the right defined in *Heller* was not conferred to any type of firearm in self-defense, but those " 'in common use' " and " 'typically possessed by law-abiding citizens for lawful purposes' " as opposed to "dangerous and unusual weapons." *Heller II*, 698 F. Supp. 2d at 193 (quoting *Heller*, 554 U.S. at __, 128 S. Ct. at 2815-16). The court continued:

"The plaintiffs also analogize the ban on large capacity ammunition feeding devices to the District's previous requirement, invalidated in *Heller*, that firearms be bound by a trigger lock and unloaded at all times. Pls.' Opp'n at 30. The plaintiffs assert that requiring an individual to pause to reload a firearm after discharging ten rounds of ammunition, like the invalidated trigger lock regulation, 'makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and is hence unconstitutional.' *Id.* (quoting *Heller*, 128 S. Ct. at 2818). This argument borders on the absurd. The trigger lock regulation made it functionally impossible to exercise the right of armed self-defense by 'rendering

[the firearm] inoperable.' *Heller*, 128 S. Ct. at 2817. The ban on large capacity ammunition feeding devices, on the other hand, imposes a slight burden on individuals seeking to fire more than ten rounds of ammunition by requiring them to pause for a few seconds to reload the weapon. This plainly does not render a firearm 'inoperable,' any more than the burden of having to pull the trigger repeatedly to discharge each successive round of ammunition renders a semiautomatic firearm 'inoperable' in comparison to a fully automatic machine gun." *Heller II*, 698 F. Supp. 2d at 194.

The court concluded that it would not overrule the council's findings that "assault weapons and large capacity ammunition feeding devices constitute weapons that are not in common use, are not typically possessed by law-abiding citizens for lawful purposes and are 'dangerous and unusual' within the meaning of *Heller*." *Heller II*, 698 F. Supp. 2d at 194. Therefore, on this issue, the *Heller II* court cited the holdings in *Fincher*, *James*, and *Marzzarella* and concluded that intermediate scrutiny review was unnecessary. However, it added that, as it is "beyond dispute" that public safety is a compelling government interest, the committee report detailing the dangers of assault weapons demonstrated a substantial fit between the ban and the compelling goal. *Heller II*, 698 F. Supp. 2d at 194-95.

D. Plaintiffs' Due Process and Overbreadth Challenges of the Ordinance

Plaintiffs' challenges do not result from a specific conviction for possession of a certain firearm as in *Fincher* and *James*. Nor are plaintiffs' challenges the same as in *Heller* or *McDonald* where a categorical ban of all handguns was overturned. Plaintiffs argue that the term

"assault weapon" is a relatively recent pejorative term created by legislators in efforts to demonize guns and gun owners. They assert that the Ordinance improperly implicates commonly used handguns and it is therefore violative of the protections of the second amendment as defined in *Heller* and *McDonald* under either strict or intermediate scrutiny. As such, plaintiffs argue that the Ordinance violates the second amendment, is overbroad and violates their due process rights as vague and undefined.

Protection of the public from the brutality and expense that can occur from the proliferation of assault weaponry is the stated purpose of the Ordinance as laid out in its prefatory statements. As addressed above, courts from *Heller* down have made clear the obvious harm certain weaponry and citizens may cause and restricting some categories is not only an important governmental objective, but may be presumptively valid. We follow these holdings and consider whether the scope of the right announced in *Heller* reaches the Ordinance's restrictions such that they are an improper ban of protected firearms which are not substantially related to an important government interest.

Plaintiffs contend that the Ordinance is not narrowly tailored or substantially related to the stated goal. They cite to studies that note the minimal use of assault weapons in gun crimes as well as how many of the defined guns and gun attributes that are banned under the ordinance are not the type of advanced weaponry utilized by the military. Plaintiffs conclude that many of the banned guns are commonly owned and utilized in homes as part of the deeply rooted history of our country for the fundamental right of self-defense that is fundamental to our scheme of ordered liberty.

Plaintiffs also argue that the Ordinance is so vague and overbroad that it must be stricken generally under the overbreadth doctrine. Plaintiffs contend that no evidence was provided to support defendants' claim that firearms for hunting, recreational use and protection were allowed. Conversely, plaintiffs argue that their pleadings fully demonstrated that commonly used firearms were banned and that the Ordinance violates due process due to being unconstitutionally vague as arbitrary, and capricious in its content and enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

Plaintiffs argue that the ordinance is void on its face. As our supreme court has explained, "a statute is normally not unconstitutional on its face unless it provides no standard of conduct at all, *i.e.*, the ambiguity is so pervasive that it is incapable of any valid application. [Citation.] Facial challenges to legislation are generally disfavored." *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 442 (2006). However, plaintiffs assert that the Ordinance may be found impermissibly vague, even if it does not reach protected conduct, if it does not establish sufficient enforcement standards. *Kolender*, 461 U.S. at 358. Plaintiffs claim that they established before the trial court that the list of banned firearms and other definitions are vague and, as a result, they cannot determine whether certain firearms are banned. They contend that the inclusion of "copies" or "duplicates" does not provide any clarity or eliminate the vagueness of the Ordinance, but adds to the confusion as to what firearms are actually banned. Plaintiffs also argue that the Ordinance lacks guidelines for enforcement.

The Ordinance is similar to those that withstood challenges in *Heller II* and *James*. The *Heller* Court and subsequent interpretations of that decision made clear that the second

amendment in no way provides protections from restrictions on uncommon or unusually dangerous weapons. As found in *James*, *Heller II*, and *Fincher*, the second amendment right does not extend to assault weapons. Whether or not this is a recently manufactured pejorative term, the Ordinance withstands challenge as long as it is sufficiently tailored like the restrictions in these cases.

As detailed above, the Ordinance is not a blanket prohibition on common handguns as that before the *Heller* and *McDonald* courts. Rather, the Ordinance is a ban on a subcategory of weapons that advance beyond ordinary handguns utilized for self-defense in an attempt to reduce the rate and intensity of crimes and associated costs. The *James* and *Heller II* courts reviewed bans on nearly identical weapons as in the Ordinance, and the legislative findings in *James* and *Heller II* mirror those cited in the Ordinance. In the instant case, the trial court reviewed and detailed the Ordinance's specific list of weapons and detailed definitions of what constitutes an assault weapon in its extensive 14-page order.

The aforementioned definitions and examples constitute objective criteria for enforcement. We agree with the trial court that the terms "copies" and "duplicates" in the Ordinance are not vague, but have plain and ordinary meanings. These weapons, or attributes of weaponry, advance beyond the common handgun, rifle, or shotgun, and are substantially related to the purpose of the Ordinance. The fundamental right to firearm ownership for self-defense purposes in the home is subject to "important" limitations, such as the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at__, 128 S. Ct. at 2817. As in *James* and *Heller II*, the restrictions of the Ordinance are fairly supported by this historical tradition and

allow for continued protected use of common firearms and do not violate plaintiffs' constitutional rights.

As for plaintiffs' other claims, the overbreadth doctrine was judicially created as an extraordinary tool to protect first amendment rights from the chilling effect of an overbroad statute. *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 436 (2006). Under this doctrine, the challenger to a statute has the burden of proving that substantial overbreadth exists based on the text of that particular law and facts as well as proving that a substantial amount of protected conduct is impacted. *Pooh Bah*, 224 Ill. 2d at 437, 442. However, as defendants argue, even if plaintiffs could prove this, Illinois courts have not recognized this doctrine outside of the first amendment context. *People v. Greco*, 204 Ill. 2d 400, 407 (2003).

We will not extend this doctrine in the instant matter. Further, plaintiffs' assertion that it should be applied in this case in light of *Heller* also fails. As described above, *Heller* did not pronounce the second amendment right as fundamental for any and all weaponry. As discussed, the Ordinance properly limits its restriction to delineated arms that are rapid-firing or high-capacity. Accordingly, plaintiffs' overbreadth argument fails.

The trial court properly reviewed the language of the Ordinance and found it sufficiently tailored to not be considered impermissibly vague to violate due process. Furthermore, the important consideration on a vagueness review is whether the Ordinance provided specific standards such that a person of ordinary intelligence could understand the prohibitions and it could be properly enforced. Defendants admit that the Ordinance is broadly drawn, and it is, but that does not make it impermissibly vague. The trial court properly found that plaintiffs did not

state a cause of action based on the plain meaning and adequate detail provided in the Ordinance. The Ordinance is sufficiently detailed and substantially related to an important government objective.

### E. Equal Protection Claim

Plaintiffs next contend that the Ordinance violates the equal protection clause of the fourteenth amendment. Plaintiffs argue that the Ordinance treats similarly situated persons differently based on the type of firearms owned. Plaintiffs conclude that, because the second amendment right is a fundamental right, examination of the claim that disparate treatment of similarly situated persons requires more than the rational basis analysis utilized by the trial court.

However, plaintiffs' argument here is insufficient to require such review. Citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992), the trial court noted that not all classifications are barred by the equal protection clause. Rather, the equal protection clause "simply keeps governmental decision[-]makers from treating differently persons who are in all relevant respects alike." *Nordlinger*, 505 U.S. at 10. Suspect classifications include race, national origin, sex and illegitimacy. *People v. Botruff*, 212 Ill. 2d 166, 176-77 (2004). Assault weapons owners do not comprise a suspect classification. While a fundamental right to possess handguns in the home for the purposes of self-defense has been announced, the Ordinance provides a nonexhaustive list of weapons and the copies or duplicates of those weapons that are banned. Importantly, the Ordinance also provides further specific guidelines and attributes to determine what types of weapons are covered. Plaintiffs failed to allege any facts that two owners of similar firearms would be treated differently under the Ordinance, the trial court properly dismissed plaintiffs'

equal protection claim.

## F. Waiver

Finally, the trial court also considered in detail plaintiffs' argument that the Ordinance failed to provide a *scienter* requirement and whether the Ordinance violates article I, section 22, of the Illinois Constitution. Defendants argue that plaintiffs forfeited these arguments on appeal for failing to raise the issues under Rule 341(h)(7). Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006). Plaintiffs respond that they appealed the entire dismissal order, the trial court discussed the *scienter* issue extensively for four pages and they fully argued the Illinois Constitution before the trial court. Plaintiffs claim that they "clearly addressed" these issues by arguing that *Kalodimos* was overruled, citing to the Illinois Constitution in the appendix to their brief, and asserting the trial court misconstrued their arguments on the *scienter* issue.

Plaintiffs do not raise these issues on their own merits or provide authority to support their arguments. We will not conduct research or provide arguments for parties. Failure to establish the facts and authority for an argument supports a finding that an issue is waived under Rule 341. *Feret v. Schillerstrom*, 363 Ill. App. 3d 534, 541 (2006). Plaintiffs' only mention of our constitution is with respect to the argument involving *Kalodimos*. Likewise, plaintiffs' only mention of this issue is limited at best. In one sentence on page 14 of their brief, they claim that the trial court "clearly misconstrued Plaintiffs['] arguments regarding *Staples v. U.S.*, 511 U.S. 600 (1993), as it distinguished *U.S. v. Freed*, 401 U.S. 601 (1971)," followed by citation to the amended complaint and court order in the record. No discussion of the issue or these cases or any analysis to support the contention that the court erred is provided. Plaintiffs' one-sentence

statement is inadequate, and their failure to provide support or analysis of these issues constitutes waiver pursuant to the rules of our court.

### III.  CONCLUSION

For the foregoing reasons, the order of the trial court is affirmed.

Affirmed.

No. 1-08-1202

Please Use Following Form:

**Complete TITLE of Case**

**MATTHEW D. WILSON, TROY EDHLUND, and JOSEPH MESSINEO,**

**Plaintiffs-Appellants,**

**v.**

**COOK COUNTY, a public body and corporate, TODD STROGER, Board President, in his official capacity, and its Board of Commissioners in their official capacities, namely: EARLEAN COLLINS, ROBERT STEELE, JERRY BUTLER, WILLIAM M. BEAVERS, DEBORAH SIMS, JOAN PATRICIA MURPHY, JOSEPH MARIO MORENO, ROBERT MALDONADO, PETER N. SILVESTRI, MIKE QUIGLEY, JOHN P. DALEY, FOREST CLAYPOOL, LARRY SUFFREDIN, GREGG GOSLIN, TIMOTHY O. SCHNEIDER, ANTHONY J. PERAICA, ELIZABETH ANN DOODY GORMAN, and THOMAS DART, Sheriff of Cook County, in his official capacity,**

**Defendants-Appellees.**

**Docket No.**

**COURT**

**Opinion Filed**

**Nos. 1-08-1202**
**Appellate Court of Illinois**
**First District, THIRD Division**

**JUSTICES**

**February 9, 2011**
**(Give month, day and year)**

**PRESIDING JUSTICE MURPHY delivered the opinion of the court:**

**Quinn, Presiding Justice and Neville, J.,** **concur [s]**

APPEAL from the Circuit Ct. of Cook County, Criminal Div.

**Lower Court and Trial Judge(s) in form indicated in the margin:**

**The Honorable** **Mary K. Rochford** **, Judge Presiding.**

For APPELLANTS, John Doe, of Chicago.

**Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.**

**Attorneys for Plaintiffs-Appellants:** **Victor D. Quilici**
**(Co-counsel)** **P.O. Box 428, River Grove, IL 60171**
**Phone: (847) 298-2566**

**Eric Swanson** **Edward Ronkowski**
**71 N. Ottawa St., Joliet, IL 60432** **20821 Briarwood Lane, Mokena, IL 60448**
**Phone: (815) 723-1716** **Phone: (708) 479-4417**

For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)

**Patrick Cummings, Ciardelli & Cummings Of counsel: Stephen P. Hallbrook**
**19 W. Jackson, 3rd Floor, Chicago, IL 3925 Chain Bridge Rd., Suite 403**

**Phone: (312) 346-2522**                    **Fairfax, VA 22030 - Phone: (703) 352-7276**

**Attorneys for Defendants-Appellees:**   **Anita Alvarez, State's Attorney of Cook County**
                                          **Of counsel: Patrick T. Driscoll, Jr., Deputy State's Attorney**
                                          **Paula A. Castiglione, Marilyn Fusco Schlesinger**
                                          **Asst. State's Attorneys**
                                          **500 Richard J. Daley Center, Chicago, IL 60602**
                                          **Phone: (312) 603-3362**